EMERALD HOME BUILDERS, INC., Plaintiff-Appellee, *v.* VAL KOLTON, JR. *et al.*, Defendants—(THE CITY OF CHICAGO, Defendant-Appellant.)

(No. 56853;

First District (5th Division)—May 11, 1973.

Richard L. Curry, Corporation Counsel, of Chicago, (William R. Quinlan and Robert R. Retke, Assistant Corporation Counsel, of counsel,) for appellant.

Edward R. Burr, of Chicago, for appellee.

Mr. JUSTICE ENGLISH delivered the opinion of the court:

This is an appeal by the City of Chicago from a judgment ordering it to re-issue a building permit and enjoining it from interfering with plaintiff's construction on the subject lot.

The facts are essentially undisputed. The property, located at 7002 W. Talcott, Chicago, is a 5000-square-foot portion of a larger lot from which it was severed prior to the 1957 amendment to the Chicago Zoning Ordinance. Municipal Code of Chicago, ch. 194A.

In October, 1968, plaintiff, by its treasurer, Richard Cross, having responded to an advertisement by the seller, contracted to purchase this lot from defendant Val Kolton, Jr., for the sum of $13,000. The property was within an R-1 (single-family residence) zoning district. In preparing the contract of sale, Kolton included a provision that the sale would be conditional upon plaintiff's obtaining a permit to build a single-family residence on the lot. Cross, who did not have counsel during the negotiations of the contract, had not requested the inclusion of such a condition in the contract, and the matter of a building permit was not discussed at the time. Although unfamiliar with the zoning ordinance, Kolton was sure that it would be possible to obtain such a permit. Cross was also unfamiliar with the terms of the zoning ordinance, it being his practice merely to obtain a building permit which would then tell him what he could build.

On November 2, 1968, after signing the contract, but before closing, Cross submitted an application for a permit to erect a single-family residence, accompanied by architectural plans, a survey, and other documents, to the Department of Buildings of the City of Chicago. Plaintiff had obtained a land loan at the cost of $856.32, and had paid $134 for the architectural plans and the survey, as well as $174.65 in fees for building and driveway permits. The Building Department followed the ordinary procedure concerning an application for a building permit, which included approval by the plumbing, electrical, and zoning departments, and on November 27, 1968, issued the requested permit to plaintiff. Thereafter, on December 3, 1968, the real-estate contract was consummated, and plaintiff delivered to Kolton the balance remaining

on the $13,000 purchase price. The lot was then promptly excavated at a cost of $575, and plaintiff entered into a contract for the placement of concrete footings at a cost of $800.

The excavation work and installation of the concrete footings had been completed when, in January or early February, 1969, a city alderman requested that plaintiff stop construction on the subject property. Plaintiff complied with this request immediately. The alderman suggested to the Department of Buildings that the lot did not meet the minimum area requirements of the zoning ordinance for the district in question. For that stated reason, the Department mailed an official notification to plaintiff, dated February 18, 1969, to stop all work at the subject lot. On May 28, 1969, the Department revoked plaintiff's building permit because "six months elapsed," and plaintiff was ordered to barricade the construction and refill the excavation. Thereupon, plaintiff contracted for this work to be done and the city filed suit against plaintiff asking that plaintiff be fined in addition to being required to backfill the excavation. Judgment was entered on the prayer of the complaint and plaintiff complied therewith, paying $150 for the construction of barricades and $300 for the backfill.

Plaintiff's suit followed in which it alleged that in addition to the amounts of money set forth above, it had also paid the real estate taxes on the subject property as of the date it acquired title; and that, due to the inflation of the cost of labor and materials, its computation of the intended construction would cost, as of the time of the trial, from $2500 to $3000 more than it would have if plaintiff had been permitted to continue construction without any interference from the city.

Plaintiff's amended complaint was in two counts against both Kolton and the city, praying for: (1) rescission of the purchase contract with Kolton and refund of the $13,000 purchase price; or (2), in the alternative, a writ of mandamus directing the city to re-issue the building permit for construction of a single-family residence on the subject property and enjoining the city from interfering with plaintiff's right to build such a residence.

The trial court dismissed Count I of the amended complaint, but as to Count II it (1) found that the city was estopped from revoking the building permit and ordered it to rescind its previous revocation order; (2) held that the R-1 lot-size requirement was inapplicable for the reason that the subject property was a "lot of record" prior to enactment of the amendment to the zoning ordinance; and (3) enjoined the city from interfering with plaintiff's construction on the subject lot.

It is from this judgment that the city now appeals, raising two issues:

(1) the subject property was not a "lot of record" within the meaning of sections 3.2 and 7.5(2) of the Chicago Zoning Ordinance, and, therefore, did not qualify for a residential building permit; and (2) the city is not estopped from revoking a building permit issued in violation of the zoning ordinance even though plaintiff, in reliance upon possession of the permit, has expended sums for purchase of the lot and has begun construction thereon.

Section 7.5—1 of the Chicago Zoning Ordinance provides that not less than 6250 square feet of lot area per dwelling unit is required in an R-1 zoning district. Section 7.5(2) of the same zoning ordinance, however, creates an exception to the 6250-square-foot requirement by providing that a one-family dwelling may be built in any residence district on a "lot of record on the effective date of this comprehensive amendment (1957) regardless of the size of the lot." The term, "lot of record," is defined in Section 3.2 of the Zoning Ordinance as follows:

"A "lot of record" is an area of land designated as a lot on a plat of subdivision recorded or registered, pursuant to statute, with the Recorder of Deeds of Cook County and the Ex-officio Examiner of Subdivisions of the City of Chicago."

The city argues that since there was no evidence that the 5000 square-foot parcel in question was designated as a lot on a plat of subdivision recorded or registered with the Recorder of Deeds of Cook County, there was a failure of proof that the lot qualifies as a "lot of record," and, therefore, the lot does not come within the exception to the minimum lot size requirement.

■■ We agree with the city that the instant property is not a "lot of record," as it has not been designated as a lot on a recorded plat of subdivision. Looking to the Plat Act (Ill. Rev. Stat. 1969, ch. 109, par. 1, et seq.), the statute alluded to in the definition of "lot of record," the owner of the single recorded lot from which the instant property was severed, was exempted from recording a new plat of subdivision on that account. However, the fact that a plat need not have been recorded does not mean that it could not have been so filed, thus rendering the subdivided lot a "lot of record" within the clear statutory definition of the Plat Act. There was no evidence of such filing. Since the property therefore does not come within the definition of "lot of record," it cannot come within the exception to the minimum lot size requirement, and a building permit should not have been issued.

■■ Notwithstanding this fact, we note that the building permit was never properly revoked. Although the reason cited for the stop work order was non-compliance with the zoning requirements for a single-family

residence district, that order was not intended, and cannot be construed, as a revocation of the building permit. Looking to the document of revocation itself, issued on May 28, 1969, the only stated reason was that six months had elapsed (the day before) without plaintiff's having commenced the construction authorized by the permit. It is true that Chapter 43, Section 43—9, of the Municipal Code of the City of Chicago provides that a building permit shall be void if operations thereunder are not begun within six months after the date of issuance. However, operations in this case were begun with the excavation and the installation of concrete footings within two months of the issuance of the permit, and were stopped only on direction of the city itself. Under this circumstance, it would be wholly unconscionable, as well as unreasonable and unlawful, for the city to revoke plaintiff's building permit for failure to have begun operations within six months.

Nonetheless, even if the permit had been properly revoked, we could not agree with the city's contention that estoppel is not appropriate in this case, as was held by the trial court.

■■ The doctrine of equitable estoppel as against a city has been discussed at great length in *Cities Service Oil Co. v. City of Des Plaines*, 21 Ill.2d 157, 171 N.E.2d 605. In that case, a building permit was issued on August 30, 1957, for the construction of a gas station. Plaintiff had bought the property in September, 1957, and on October 16, 1957, the transfer of the permit from the seller to plaintiff was approved. Construction started in late February, 1958, and three weeks later, the police appeared and stopped the work. By a subsequent letter from the mayor, dated March 19, 1958, plaintiff was informed that his permit was being revoked because of an ordinance violation. By that time, plaintiff had paid the contractors $5,373.46 for work done and would have been obliged to pay $1,050 to restore the property to its former condition. Plaintiff brought suit against the city to enjoin it from enforcing the zoning ordinance and was granted relief. The city appealed, contending that the trial court erred in holding the city estopped from preventing erection of the service station. The court stated at pp. 160-161:

> "The general rule is that a city cannot be estopped by an act of its agent beyond the authority conferred upon him. [Citations.] It has been stated that anyone dealing with a governmental body takes the risk of having accurately ascertained that he who purports to act for it stays within the bounds of his authority, and that this is so even though the agent himself may have been unaware of the limitations on his authority. [Citation.] In matters involving strictly public rights the courts do not interpose to hold

the municipality estopped except under special circumstances which would make it highly inequitable or oppressive to enforce such public rights. [Citation.]

The general rule is qualified, however, to enable a party to invoke the doctrine where his action was induced by the conduct of municipal officers, and where in the absence of such relief he would suffer a substantial loss and the municipality would be permitted to stultify itself by retracting what its agents had done. [Citations.]"

The court went on to hold that under the special facts and circumstances of the case, it would have been inequitable for the city to enforce removal of the improvements which had been installed in reliance upon the permit. The qualification to the general rule was held to have been met because "plaintiff had expended large sums of money in reliance upon the permit and the apparent acquiescence by the city officials."

And this, even though plaintiff's actions had not initially been induced by the conduct of any municipal officers. The lapse of seven months without any attempt to revoke the permit was seen by the court as "conduct on the part of city authorities from which it could reasonably be inferred that its issuance was, in effect, ratified."

■■ In our opinion, the factual situation of the case at bar is sufficiently similar to that in the *Cities Service* case to be controlled by its decision. In reliance upon the issuance of the building permit, the instant plaintiff spent a total of $15,560.97, including the cost of the real estate (the contract being contingent only upon the issuance of the permit), and excluding the $450 spent to restore the property to its former condition, plus an unknown sum for real estate taxes.

Although here, too, there was no initial inducement by the municipal authorities, there was a six-month lapse between the date the permit was issued and the date revocation was attempted, and a 2- to 2½-month lapse between the start of the excavation work and receipt of the stop work order. Even if reliance were to be placed upon the 2- or 2½-month period, the situation is analogous to the *Cities Service* case when it is noted that in that case the police stopped the construction work only three weeks after it had begun, and the permit was actually revoked one month after the construction had begun. In the case before us, the initial excavation was a type of operation sufficient to put the city on notice that its permit to build was being relied upon. In this circumstance, a delay of one month before revocation, as in the *Cities Service* case, or a delay of more than five months before revocation (or even 2 to 2½ months before stopping work, as in the instant case, compared to three

weeks in *Cities Service*) constituted an inducement to plaintiff to assume in good faith that the permit, valid on its face, was valid in fact and in law through ratification by the city.

The judgment of the circuit court is affirmed.

Affirmed.

LORENZ, P. J., and DRUCKER, J., concur.